UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

BERNARD FERGUSON,                                    :

                                  Plaintiff,       :

                   - against -                                   :

U.S. DEPARTMENT OF EDUCATION,          :

                              Defendant.     :

----------------------------------------------------------x

```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #: _____         │
│ DATE FILED:   9/13/11_____    │
└─────────────────────────────────┘
```

**<u>DECISION AND ORDER</u>**

09 Civ. 10057 (FM)

**FRANK MAAS**, United States Magistrate Judge.

        This <u>pro</u> <u>se</u> action is brought pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, by plaintiff Bernard Ferguson ("Ferguson").  Ferguson is an attorney who also serves as President of the International Association of Medical Colleges, a not-for-profit organization.  In the latter capacity, Ferguson seeks documentation from the United States Department of Education ("Department") concerning foreign medical schools.  The Department has moved for summary judgment on the ground that its search for such documents constituted a thorough, reasonable, and adequate response to Ferguson's request.  For the reasons set forth below, the Department's motion for summary judgment is granted in part and denied in part.

I.      Background

    A.      National Committee on Foreign Medical Education and Accreditation

            The Department is the entity responsible for keeping the records of the

National Committee on Foreign Medical Education and Accreditation ("Committee"),

which is charged with "determining whether the standards of accreditation used by a

foreign country to accredit medical schools are comparable to the standards of

accreditation applied to M.D. programs in the United States."  (See Decl. of Charles J.

Mula, dated Feb. 28, 2011 ("Mula Decl."), ¶ 6).  Accordingly, a foreign country seeking a

determination that its standards are comparable to those of medical school programs in

the United States must comply with the Committee's "standardized submission process."

(Id. ¶ 7).  As part of that process, foreign country applicants must submit "a narrative

about the governance and structure of the country's postsecondary education system; a

description of the specific standards the country uses to evaluate its medical education

programs and evidence documenting the application of such standards; and information

concerning, and evidence documenting, matters such as evaluator qualifications, controls

against conflict of interest, and monitoring."  (Id.).  The Committee, however, "does not

mandate the submission of specific documents."  (Id. ¶ 9).  Thus, "[i]t is not unexpected

or unusual for one country's submission to look different from that of another country."

(Id.).

            The Committee convenes twice each year to review applications from

foreign countries.  (Id. ¶ 11).  The Committee "consider[s] the materials submitted and

the testimony presented [from the country's representative in attendance]" and may

determine at the meeting that "a country's medical school accreditation standards are

comparable to U.S. standards."  (Id.).  The Committee's "determinations of comparability

have a maximum duration of six years from the date of issuance, except where the

Committee earlier withdraws, extends, or renews its determination."  (Id.).

   In 2007, when Ferguson submitted his FOIA request to the Department,

"any accredited medical school in a country the Committee determined to be comparable

could apply to the Department to participate in the Federal Family Education Loan

('FFEL') program."  (Id. ¶ 12).  If a medical school's application was approved, any

enrolled student who was a citizen or permanent resident of the United States could

receive an FFEL loan for his schooling, provided that the program's other eligibility

requirements were met.  (Id.).  Within the Department, the Foreign Schools Team is

responsible for overseeing foreign postsecondary schools that participate in the FFEL

program.  (Decl. of Barbara E. Hemelt, dated Feb. 28, 2011 ("Hemelt Decl."), ¶ 8).  The

Foreign Schools Team is part of the Department's Office of Federal Student Aid ("FSA").

(Id. ¶ 1).

  B. <u>FOIA Request</u>

   On August 3, 2007, Ferguson submitted a FOIA request ("Request") to the

Department seeking the following information:

    1. The last submission and/or documentation by all
     countries for recognition by the Department that the
     medical schools charte[re]d within that country are

governed by accreditation standards that are
comparable to those used in the United States.

2.      The staff's recommendations to the Committee[.]

3.      The Countries['] responses.

4.      The . . . Secretary of Education's official notification
of the Department's findings.

5.      Any application/documents to the Department's
Foreign Schools Team that the [foreign medical
school] applicant meets the regulatory requirements to
participate in the [FFEL] Program.

6.      The final response to that application.

(Decl. of Angela Arrington, dated Feb. 28, 2011 ("Arrington Decl."), Ex. A).

The Department's FOIA Service Center determined that the Office of

Postsecondary Education ("OPE") held records responsive to the first four items of the

Request and that the FSA maintained records responsive to items five and six.  (Id. ¶¶ 9-

10).  Accordingly, on or about November 19, 2007, the Request was transmitted to OPE

and FSA.  (Id. ¶ 11).

C.      Department's Initial Search and Production

1.      OPE

OPE processed Ferguson's Request using its standard procedures.  (See

Mula Decl. ¶ 15).  First, the OPE FOIA coordinator distributed the Request to OPE's

Accreditation Division, which maintained responsive records.  (Id. ¶ 16; see id. ¶ 13).

The electronic records manager of the Accreditation Division determined that responsive

4

records were stored in an electronic system known as "Panagon" and in a "shared file on the K:/ drive folder named ACE_DOCS."  (Id. ¶¶ 13(c), 16).  The Panagon system contains two folders:  one organized by Committee meeting dates and the other organized by country.  (Id. ¶ 13(c)).  The meetings folder is organized chronologically and "indicates which countries are discussed at a given meeting."  (Id.).  The country folder "contains each country's application and supporting documentation."  (Id.).  The Panagon folder organized by meeting date contains the same data as the ACE_DOCS folder on the K drive.  According to the Department, there are no other repositories within the Department of "records concerning the work of the Committee."  (Id.).

In response to the Request, the electronic records manager of the OPE Accreditation Division searched both the Panagon system and the ACE_DOCS folder for "documentation and decisions pertaining to foreign countries' applications for Committee review from 2000 to 2007."  (Id. ¶ 17).  As the first part of that search, the manager "reviewed each meeting file in the Panagon system's Committee meeting folder for the relevant time period and identified which countries made applications for review.  The manager then located the application and/or supporting documentation, if any, for each country by opening the file for that country in the Panagon system's country folder and the staff report and decision letter in the ACE_DOCS folder."  (Id.).

The responsive records were electronically collected and stored on a shared drive.  (Id. ¶ 18; see id. ¶ 13(e)).  Thereafter, the responsive records, totaling 6,740 pages, were uploaded into the Department's electronic FOIA system, "FOIAXpress," and

reviewed for material exempted from disclosure.  (Id. ¶ 18; see id. ¶ 13(e), (f)).  OPE

determined that portions of 111 pages contained material subject to Exemptions 4 and 6

of FOIA, 5 U.S.C. § 552(b)(4), (b)(6), and redacted the records accordingly.[1]  (Id. ¶ 19).

On June 5, 2008, OPE sent Ferguson a CD containing the records responsive to items one

through four of the Request and explained the basis for its withholding of certain

information.  (See Arrington Decl. Ex. B).  Ferguson paid the fees associated with OPE's

search and production of responsive records.  (Id. ¶ 17).

       2.    FSA

FSA is the "sole custodian" of "documents concerning the work of the

Foreign Schools Team with respect to eligibility certifications and recertifications of

foreign medical schools that participate in" FFEL programs.  (Hemelt Decl. ¶ 4).  For that

reason, the FOIA Service Center sent FSA items five and six of the Request, which

sought information concerning applications submitted to the Foreign Schools Team.

(Arrington Decl. ¶¶ 10-11).  Barbara Hemelt, a team leader within the Foreign Schools

Team, was responsible for conducting FSA's search for responsive records.  (Hemelt

Decl. ¶¶ 1, 3).

In December 2007, Hemelt contacted Ferguson to clarify the scope of items

five and six of the Request because she considered them "ambiguous."  (Id. ¶¶ 3, 10).

The Department contends that Hemelt and Ferguson "agreed[] that he wished to receive

---

[1]     These redactions were made to protect such information as the applicants'
proprietary budget information and personally identifiable information.  (Mula Decl. ¶ 19).

records related to the Department's eligibility decisions made with respect to initial applications from foreign medical schools dating to 2000." (Id. ¶ 11).  As Hemelt explains, the year 2000 was selected as the cut-off date because that was when the Department began to track eligibility decisions electronically through FSA's "management information repository" known as the Postsecondary Education Participants System ("PEPS").[2]  (See id. ¶¶ 11-12).  Hemelt informed Ferguson that between 2000 and 2007, "the Department had issued decisions on six initial applications from foreign medical schools."  (Id. ¶ 13).

According to the Department, Ferguson further agreed to "modify the scope of the Request to include decisions on completed recertification applications as well as initial certifications, but to exclude pre-2000 certification decisions and records concerning pending applications (i.e., applications as to which the Department had made no final decision)."  (Id.).  The Department maintains that Ferguson also agreed to exclude foreign medical schools' catalogs from his Request due to their bulk.  (Id.).

Ferguson offers a slightly different account of his communications with Hemelt, but does not appear to dispute that he ultimately agreed to the date range she proposed.  (See Decl. of Bernard Ferguson, dated Mar. 31, 2011 ("Ferguson Decl."),

---

[2]       PEPS contains information for "all entities associated with the Title IV Higher Education Act student financial aid programs.  PEPS generates school identification numbers for FSA operations systems and other institutional information, and maintains eligibility, certification, demographics, financials, program reviews, audit and default rate data about schools and financial partners participating in the Title IV programs."  (Hemelt Decl. ¶ 12).

¶ 48 ("While my digest of the discussion with Barbara Hemelt on December 4, 2007 did not include . . . my agreement with Barbara Hemelt to limit my schools request to when their electronic system began in 2000, I did agree with her in this discussion.  Because this spared her an unnecessary, onerous, time consuming, mostly unproductive search.").

In December 2007 and January 2008, Hemelt searched for records relating to the Department's decisions during the 2000-2007 time frame regarding certification and recertification applications submitted by foreign medical schools.  (Hemelt Decl. ¶ 14).  The first part of that search identified initial applications; the second part located recertification applications.

Hemelt began her search by querying the PEPS database for all approved and denied initial and recertification applications completed between January 1, 2000 and December 4, 2007.  (Id. ¶¶ 15, 17).  Because the list generated by these queries did not identify the applicant institutions, (id. ¶¶ 16, 18), Hemelt generated another PEPS report to obtain the name of "every foreign institution that had an initial certification application completed during the 2000-2007 time period."  (Id. ¶¶ 19-20).  Hemelt then compared the names from that report "against a list of current or former participating foreign medical schools."  Based on that comparison, Hemelt identified six foreign medical schools whose initial applications were completed during the relevant time period.  (Id.).

The second part of Hemelt's search, which identified recertification applications from foreign medical schools, (see id. ¶ 21), largely mirrored her search for

8

initial applications.  Hemelt first reviewed the results of her queries to create a list of all approved and denied recertification applications during the relevant time period.  (Id. ¶¶ 22-23).  Hemelt then generated a PEPS report listing all the institutions that had submitted recertification applications during the relevant time period.  (Id. ¶¶ 25-26).  Hemelt then compared that report with a list of current or former participating foreign medical schools and identified thirty-eight foreign medical schools that completed a recertification application between 2000 and 2007.  (Id. ¶ 26).

In total, Hemelt's "searches for initial and recertification applications completed for foreign medical schools between 2000 and 2007 located forty-four certification actions."  (Id. ¶ 27).

### 3.    FSA's Production of Responsive Records

Hemelt and her staff identified and retrieved the responsive records for the forty-four certification actions she located through her PEPS searches.  These records were copied from FSA's electronic archives and, to the extent they were not electronically archived, from the hard copy case folders.  (Id. ¶¶ 28-29).  Hemelt represents that this search entailed a review of "[a]ll FSA files likely to contain records responsive to Items 5-6 of Mr. Ferguson's Request."  (Id. ¶ 28).  She and her staff identified information on 896 pages (out of 9,225 pages of responsive records) that required redaction pursuant to FOIA Exemptions 2, 4, 5, and 6.[3]  (Id. ¶¶ 30, 32).

---

[3]    See 5 U.S.C. § 552(b)(2), (b)(4), (b)(5), (b)(6).  These redactions were made to protect such information as passwords and identification numbers, applicants' proprietary budget

(continued...)

On January 25, 2008, the responsive records identified by Hemelt and her staff were uploaded to FOIAXpress for further review and production.  (Id. ¶ 32). Thereafter, on August 25, 2008, the Department sent Ferguson a CD containing 9,225 pages of records responsive to items five and six of the Request, with redactions on 896 pages, and explained the basis for its redactions.  (Arrington Decl. ¶ 21 & Ex. C). Ferguson paid the fees associated with FSA's search and production of responsive records.  (Id. ¶ 23).

D.     Ferguson's FOIA Appeal and the Instant Action

On September 30, 2008, the Department received Ferguson's appeal from the Department's decision to deny, in part, his Request.  (See id. Ex. D).  In that appeal, Ferguson complained about the "extraordinary" delay in the production of the responsive records, the Department's denial of his fee waiver, the omission of certain records pertaining to foreign medical schools, and the inclusion of unresponsive records.  (Id.). Ferguson, however, did not contest the redactions made pursuant to FOIA exemptions. (See id.).

During spring 2009, the Department's FOIA Service Center contacted Ferguson to clarify the scope of his appeal.  (Id. ¶ 28).  Ferguson and the FOIA liaison subsequently communicated regarding records that Ferguson believed were improperly omitted from the OPE and FSA productions.  (See ECF No. 1 ("Compl." or "Complaint")

---

<sup>3</sup>(...continued)
information, privileged deliberative materials, attorney-client communications, attorney work product, and personally identifiable information.  (Hemelt Decl. ¶ 30).

Ex. 5).  Upon further review, the FOIA liaison identified certain additional documents

responsive to the Request that had not been produced in 2008.  (See id. at 9).  As a

consequence, in April 2009, the Department sent Ferguson five additional CDs of

responsive records.  (See id. at 7).  Ferguson suggests that these additional records were

"a little helpful but not close to being complete disclosure."  (Id.).

       While the administrative appeal was pending, Ferguson filed this lawsuit on

December 8, 2009.  (See Compl.).  In his Complaint, Ferguson claims that there was "no

legal basis" for the Department's denial of his "access" to the requested records, and he

seeks an order directing the Department to disclose those records.  (Id. at 2).  Ferguson

does not challenge the Department's denial of a fee waiver.  (See id.).

      E.    Supplemental Search and Production in 2010

       After Ferguson filed his Complaint, the Department offered to conduct a

supplemental search and production of records at no cost to him and "without strict regard

to whether such materials were within the scope of his Request."  (ECF No. 21 ("Def.'s

Mem.") at 7-8; see Hemelt Decl. ¶ 35).  Accordingly, FSA undertook a supplemental

search and production of records related to four foreign medical schools that Ferguson

had identified,[4] as well as "any other school within the scope of the Request [as modified

by Hemelt's discussions with Ferguson in December 2007] that had been omitted from

the 2008 production."  (Hemelt Decl. ¶ 35).  The Department agreed to search for records

_____

      [4]     These schools were St. George's University in Grenada, Ross University in
Dominica, American University of the Caribbean in St. Maarten, and St. Matthew's University
in the Cayman Islands.  (Hemelt Decl. ¶ 35).

relating to the four schools that Ferguson had identified even though the Department's certification decisions concerning them "post-dated the cutoff date for the prior search [in 2008] and thus were outside the scope of the Request." (Id. ¶ 36).  With respect to records maintained by OPE, the Department "agreed to verify that all publicly available documents responsive to . . . [the] Request concerning country comparability determinations were previously produced to [Ferguson], and to produce any such record not previously produced."  (Id. Ex. A at 4).

Hemelt and her staff used the records disclosed in FSA's 2008 production regarding Dalhousie University as a "template for the types of documents to be produced in the [supplemental] production." (Id. ¶ 37).  Based on that template, the Foreign Schools Team identified and retrieved a total of 4,942 pages of records concerning the four schools Ferguson had identified and two additional schools for which records had not previously been produced.[5]  (Id. ¶ 38).  According to Hemelt, "not all of the school files contained all of the categories of documents in the Dalhousie template, [but] all responsive, non-exempt documents maintained by the Department on those schools were produced."  (Id. ¶ 39).

As a result of her renewed search, Hemelt uploaded 4,942 pages of responsive records to FOIAXpress for further review and production.  (See id. ¶ 40).

---

[5]     The two schools were Charles University of Prague (Faculty of Medicine in Pilsen) and Universita Karlova v Praze (First Faculty of Medicine – Pilsen).  (Id. ¶ 38).

Hemelt recommended that 576 pages be redacted pursuant to FOIA Exemption 5 because these records reflected the Department's predecisional internal communications and legal advice.  (Id. ¶ 40). Thereafter, the additional records, with redactions, were transmitted to Ferguson between April and June 2010.  (See id. ¶ 41).

      F.    Procedural History

      On February 15, 2011, the parties consented to my exercise of jurisdiction over this case for all purposes pursuant to 28 U.S.C. § 636(c).  (ECF No. 19).  On February 28, 2011, the Department filed its motion for summary judgment, (ECF No. 20), arguing that it has complied with its obligations pursuant to FOIA.  Ferguson filed opposition papers on April 5, 2011, (ECF Nos. 25-26), and the Department filed reply papers on April 14, 2011, (ECF No. 24).  The motion therefore is fully submitted.

II.    FOIA

      Through its enactment of FOIA, Congress endorsed "a general philosophy of full agency disclosure." Dep't of Air Force v. Rose, 425 U.S. 352, 360 (1976) (quoting S. Rep. No. 89-813, at 3 (1965)).  "[FOIA] seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." EPA v. Mink, 410 U.S. 73, 80 (1973).  Under the statute, agencies must disclose their records upon request unless they can show that the requested records fall within at least one of nine enumerated exemptions.  See 5 U.S.C. § 552(b) (listing exemptions);

Mink, 410 U.S. at 79.  Citizens may file a challenge to an agency's response to a FOIA

request in a district court, which "shall determine the matter de novo [with] the burden

. . . on the agency to sustain its action."  5 U.S.C. § 552(a)(4).

Summary judgment is the preferred vehicle for resolving FOIA cases.  "In

order to prevail on a motion for summary judgment in a FOIA case, the defending agency

has the burden of showing that its search was adequate and that any withheld documents

fall within an exemption to the FOIA."  Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812

(2d Cir. 1994); see also Ramstack v. Dep't of Army, 607 F. Supp. 2d 94, 105 (D.D.C.

2009) (quoting Nation Magazine v. U.S. Customs Serv., 71 F.3d 885, 890 (D.C. Cir.

1995)) ("agency must demonstrate beyond material doubt that its search was reasonably

calculated to uncover all relevant documents").  The agency's search must be conducted

in good faith and "using methods that are reasonably expected to produce the requested

information."  Ramstack, 607 F. Supp. 2d at 105.  The agency is not required, however, to

"search every record in the system or conduct a perfect search."  Id. (citing SafeCard

Servs., Inc. v. SEC, 926 F.2d 1197, 1201 (D.C. Cir. 1991)).

Thus, when a plaintiff challenges the adequacy of an agency's search, "the

factual question it raises is whether the search was reasonably calculated to discover the

requested documents, not whether it actually uncovered every document extant."  Grand

Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 489 (2d Cir. 1999) (quoting SafeCard Servs.,

926 F.2d at 1201); see also Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1485 (D.C.

Cir. 1984) (reasonableness of agency's search "depends, not surprisingly, upon the facts

14

of each case").  A review of an agency's search therefore should not focus on the results of that search, but rather the search itself.  See Ramstack, 607 F. Supp. 2d at 105-06; Hornbostel v. U.S. Dep't of Interior, 305 F. Supp. 2d 21, 28 (D.D.C. 2003), aff'd, 2004 WL 1900562 (D.C. Cir. 2004).

To show that its efforts to locate responsive information complied with FOIA, an agency must set forth a reasonably detailed description of its search in affidavits or declarations.  See Grand Cent. P'ship, 166 F.3d at 478 (quoting Gallant v. NLRB, 26 F.3d 168, 171 (D.C. Cir. 1994)) (affidavits must "contain reasonable specificity of detail rather than merely conclusory statements") (emphasis in Grand Cent. P'ship).  Such affidavits are "accorded a presumption of good faith," and "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  Id. at 489 (internal quotation marks and citations omitted).  The presumption may be rebutted, however, if the plaintiff shows that the agency acted in bad faith.  Carney, 19 F.3d at 812.  "If the record raises substantial doubts regarding the agency's efforts, 'particularly in view of well defined requests and positive indications of overlooked materials,' summary judgment is not appropriate."  Ramstack, 607 F. Supp. 2d at 106 (quoting Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 326 (D.C. Cir. 1999)).

III.   <u>Discussion</u>

      The crux of Ferguson's claim is that the Department has failed to produce records that he believes should exist in its files.  Thus, Ferguson does not challenge the Department's decision to deny him a fee waiver, nor does he object to the redactions it made to the records produced.  For its part, the Department contends that it has fulfilled its obligations pursuant to FOIA by conducting a "thorough, reasonable, and adequate search."  (Def.'s Mem. at 1).  It further maintains that Ferguson's "speculation that additional documents could exist is insufficient" to deny the Department's motion for summary judgment.  (<u>Id.</u>).

     A.    <u>Agency Declarations</u>

      As an initial matter, the Department has provided detailed nonconclusory declarations made under penalties of perjury by the agency employees who conducted and supervised the searches and document production undertaken in response to the Request.  These declarants are:  (i) Charles J. Mula, a Management and Program Analyst in the Accreditation Division of OPE, who oversaw OPE's search and production; (ii) Barbara E. Hemelt, a Team Leader of the FSA Foreign Schools Team, who supervised and participated in FSA's initial and supplemental searches for records; and (iii) Angela Arrington, Director of the Department's Regulatory Information Management Services, who supervised the Department's FOIA Service Center.  (Mula Decl. ¶¶ 1-2; Hemelt Decl. ¶¶ 1, 3, 5; Arrington Decl. ¶¶ 1, 3).  Because these individuals oversaw the Department's response to the Request, their declarations are sufficient for summary

16

judgment purposes.  See Carney, 19 F.3d at 814 ("affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule 56(e)").

    The three declarations describe step-by-step the process the Department used to search for, identify, and retrieve the records responsive to Ferguson's Request. (See, e.g., Arrington Decl. ¶¶ 9-10; Mula Decl. ¶¶ 13, 15-21; Hemelt Decl. ¶¶ 10-40). More specifically, the Arrington Declaration explains that upon receipt of the Request, the FOIA Service Center determined that OPE and FSA maintained responsive records, and, therefore, transmitted the Request to those offices.  (Arrington Decl. ¶¶ 9-10). Additionally, Mula and Hemelt each state in their declarations that their offices' standard procedures for responding to FOIA requests were followed in response to Ferguson's Request.  (Mula Decl. ¶¶ 15, 22; Hemelt Decl. ¶ 43).  At OPE, that procedure entailed forwarding the Request to the Accreditation Division, the office within OPE that maintained the responsive records, and searching the Accreditation Division's electronic files, in which records relating to foreign countries' applications for comparability determinations were stored.  (Mula Decl. ¶ 13).  At FSA, the efforts to locate responsive information began with several searches of the PEPS database to identify certification and recertification actions from foreign medical schools completed between 2000 and 2007. (Hemelt Decl. ¶¶ 15-26).  FSA staff then retrieved the records for those schools from the FSA electronic archives and hard copy files.  (Id. ¶¶ 28-29).

    The Department's submissions are not conclusory and clearly provide "reasonable specificity of detail" about the manner in which it responded to Ferguson's

Request.  See Grand Cent. P'ship, 166 F.3d at 478.  The Court therefore may rely on the

Department's declarations to determine whether the Department conducted a reasonable

search.

> B.     Adequacy of the Department's Search

Liberally construed, Ferguson's papers appear to present a tri-fold challenge

to the adequacy of the Department's search.  First, he apparently contends that the

Department improperly narrowed the scope of his Request for records concerning foreign

medical schools' certifications and recertifications.  (See Ferguson Decl. ¶ 48).  Second,

Ferguson claims that the Department's search was deficient because it failed to produce

certain records relating to (i) foreign countries' applications for comparability

determinations, and (ii) foreign medical schools' certifications to participate in the FFEL

program.  (See, e.g., id. ¶¶ 11, 25-27, 29, 48).  Third, Ferguson suggests that the

Department should have taken additional steps beyond searching OPE's and FSA's

databases, such as interviewing agency employees to determine the location of responsive

records and consulting information in the public domain.  (See, e.g., id. ¶¶ 21-24; ECF

No. 26 ("Pl.'s Mem.") at 4).

> 1.     Scope of the Request

In his papers opposing the Department's motion, Ferguson first appears to

contend that he did not agree to modify the scope of his Request with respect to records

maintained by FSA.  In that regard, Hemelt states that she contacted Ferguson in

December 2007 to discuss items five and six of his Request because they were

ambiguous.  (Hemelt Decl. ¶ 10).  Indeed, those items were not limited to records in a

specific date range, but, rather, sought "any application/document" from a foreign

medical school that applied to participate in FFEL, and the Department's "final response"

to any such application.  (See Arrington Decl. Ex. A).  Hemelt states that during the

ensuing discussions, Ferguson agreed to limit those two items to records relating to

foreign medical schools' initial certifications and recertifications completed between

2000 and 2007.  (Hemelt Decl. ¶¶ 10-11, 13).

   An agency clearly may ask a requester to clarify the scope of a FOIA

request when it lacks specificity or is overbroad.  See Jarvik v. CIA, 741 F. Supp. 2d 106,

115 (D.D.C. 2010).  Additionally, an "agency may decide to limit the scope of an

ambiguous request as long as the narrowed scope is a reasonable interpretation of what

the request seeks."  Wilson v. U.S. Dep't of Transp., 730 F. Supp. 2d 140, 154 (D.D.C.

2010).

   Here, it appears that Hemelt offered to search FSA's records dating back to

2000 because of the burden involved in searching its pre-2000 records, which were not

maintained electronically.  (See Hemelt Decl. ¶¶ 11-12; Ferguson Decl. ¶ 48).  Although

Ferguson seemingly tries to suggest that he never agreed to modify the scope of his

Request during his conversation with Hemelt, it is clear that he did not reject her

suggestion.  (See Ferguson Decl. ¶ 48 (noting that Ferguson reached an agreement with

Hemelt to avoid an "onerous" and "unproductive" search)).  Indeed, had Ferguson

disagreed with Hemelt's proposed modification of the Request, he could have declined

19

her request and administratively appealed FSA's decision not to search pre-2000 records. Ferguson did not do so.  Having failed to take those steps, Ferguson cannot successfully argue in this forum that his Request remained unrestricted in terms of the applicable starting date.  Cf. Jarvik, 741 F. Supp. 2d at 115 (requester's amended FOIA request governed because requester agreed to restrict scope of his initial request pursuant to agency's offer and did not "appeal [agency's] decision to reject his initial FOIA request").  Accordingly, the only issue properly before the Court is the adequacy of the Department's response to Ferguson's Request, as modified by Hemelt's offer to search for certifications and recertifications completed between 2000 and 2007.

    2.    Records Omitted from the Production

        In his opposition papers, Ferguson makes a lengthy attempt to show that responsive Department records were not produced.  For example, Ferguson notes with respect to the Department's production of foreign countries' applications for comparability determinations that records for Australia's application in September 2007 were not produced, even though the Committee considered that application.  (Ferguson Decl. ¶¶ 8-10).  Ferguson raises similar objections with respect to applications submitted in 2008, 2009, and other years from a host of countries, including Belize, the Cayman Islands, Canada, Dominica, Grenada, Israel, Costa Rica, Hungary, India, Ireland, the Netherlands, and the Slovak Republic.  (See, e.g., id. ¶¶ 11-14, 19, 24-27, 29, 31-34, 38, 47).  Ferguson further contends that FSA's production in 2008 was deficient because he

did not receive records for all of the forty-four schools Hemelt and her staff had identified through their search.  (Id. ¶ 48.).

FOIA does not demand that the Department "conduct a perfect search" for responsive records.  See Ramstack, 607 F. Supp. 2d at 105.  Rather, FOIA simply requires that the Department conduct a search that is "reasonably calculated" to locate the relevant records.  See id. at 107.  The Department plainly has done so in this case with respect to the databases it searched.  The Department forwarded Ferguson's request to OPE and FSA because those offices were likely to maintain records responsive to his Request.  OPE and FSA then searched the databases that were likely to contain the relevant records and produced them to Ferguson to the extent that they did not contain exempt material.  (See Mula Decl. ¶ 22; Hemelt Decl. ¶ 43).  Indeed, the Department produced nearly 16,000 pages of records in 2008.  (See Arrington Decl. Ex. C).  Moreover, after Ferguson filed an administrative appeal which identified certain omissions in the Department's 2008 production, the Department voluntarily conducted a comprehensive supplemental search in 2010 for the omitted information.  (See Hemelt Decl. ¶¶ 35-41).  That production yielded nearly 5,000 pages of additional records that were provided to Ferguson.  (Id. ¶ 41).

Ferguson's focus on the results of the Department's search misses the point. See Hornbostel, 305 F. Supp. 2d at 28 ("the focus of the adequacy inquiry is not on the results").  The narrow focus of the Court's inquiry necessarily must be the reasonableness of the Department's search.  See Grand Cent. P'ship, 166 F.3d at 489.  Thus, an agency's

search may be sufficient under FOIA even if it does not uncover <u>every</u> record that a plaintiff believes is relevant and likely to exist in the agency's files.  See <u>Ramstack</u>, 607 F. Supp. 2d at 106-08 (agency's search was reasonable even though it yielded no responsive records); <u>Hornbostel</u>, 305 F. Supp. 2d at 28 (agency's failure to produce documents that were cited in responsive records insufficient to establish inadequacy of search).  Ferguson's belief that additional responsive records exist — even if correct — therefore does not render the Department's search inadequate.

> a.     <u>OPE's Production of Records Concerning Foreign Countries</u>

The bulk of the records that Ferguson contends were improperly omitted from the Department's production concern foreign country applications for comparability determinations in OPE's files.  (<u>See, e.g.</u>, Ferguson Decl. ¶¶ 19, 24, 25-27, 32-34, 39, 41, 42, 44-47).  The allegedly missing records post-date the Request that Ferguson sent to the Department in August 2007.  It appears that Ferguson mentions them because he believes that the Department has a continuing obligation to update its production regarding foreign country applications because his Request sought the "last" submissions from such countries.  (<u>See, e.g.</u>, <u>id.</u> ¶ 19 ("Due to the Department's extraordinary delay in production[,] these March 2009 presentations [from foreign countries to the Committee] now became, '*The latest submissions*.'") (emphasis in original)).  If so, Ferguson misapprehends the Department's obligations under FOIA.

The Department was not required to update its response to the Request each time the Committee considered an application from a foreign country at a subsequent meeting.  See Coven v. U.S. Office of Pers. Mgmt., No. 07 Civ. 1831 (PHX) (RCB), 2009 WL 3174423, at *9-10 (D. Ariz. Sept. 29, 2009) (rejecting plaintiff's request for "ongoing, daily copies of job vacancy announcements" issued by agency).  Rather, it was reasonable for the Department to restrict the temporal scope of its search so that the search did not become a "never ending process."  Id. at *7; see Negley v. FBI, 766 F. Supp. 2d 190, 195 (D.D.C. 2011) ("eminently reasonable" for agency to assume that plaintiff's request "was limited to documents in existence at the time of his request and within the scope of the request"); Fox News Network, LLC v. U.S. Dep't of Treasury, 739 F. Supp. 2d 515, 536 (S.D.N.Y. 2010) (commencement date of agency's search was reasonable cut-off date).

Here, the Department contends that it was reasonable to utilize the date of the Request as the cut-off for its search of OPE records, which would render any documents created in or after September 2007 outside the scope of the Request.  (See ECF No. 24 ("Def.'s Reply Mem.") at 4-5 & n.2).  The Department, however, does not explain why the Request date should be deemed the appropriate cut-off date.  In an analogous case, the District of Columbia Circuit rejected the proposition that the "use of a time-of-request cut-off date is always reasonable."  See McGehee v. CIA, 697 F.2d 1095, 1102-03 (D.C. Cir. 1983) (emphasis in original).  There, the requester claimed that the agency's date-of-request cut-off policy was unreasonable because it had failed to provide

responsive records for two years after the submission of a FOIA request.  Id. at 1100.

Although the court declined to address whether it was reasonable to use the date-of-

request as the cut-off date, it remanded that issue to the district court.  Id. at 1104.

Subsequently, in another case, the District of Columbia Circuit rejected the

agency's use of the date-of-request as the cut-off date because the agency "failed to

substantiate its claim that an 'administrative nightmare' would result" if it were to use

another date.  Pub. Citizen v. Dep't of State, 276 F.3d 634, 643-44 (D.C. Cir. 2002)

(internal citation marks omitted) (agency's policy utilizing date-of-request as cut-off date

was unreasonable both generally and as applied).  The court noted, however, that its

opinion did not preclude any federal agency from attempting to set forth a "more

compelling justification for imposing a date-of-request cut-off on a particular FOIA

request."  Id. at 644.

In this case, the Department has not offered any compelling justification for

its decision to limit its search of OPE's files to records that were created on or before

August 3, 2007 — the date of the Request.  Indeed, the Department has not offered any

reason to support that early a cut-off date.  Thus, the Department has failed to meet its

burden of establishing the reasonableness of that aspect of its search.  See McGehee, 697

F.2d at 1101 (burden of establishing reasonableness of limitations on search lies with

agency).

The question therefore becomes, what cut-off date is reasonable under the

circumstances of this case?  In this District and elsewhere, courts have found that the date

24

on which the agency <u>commences</u> its search is an appropriate cut-off date.[6]  <u>See</u> <u>Fox News</u>, 739 F. Supp. 2d at 536 (collecting cases and noting that "courts have consistently held that an agency may limit its FOIA search to records created on or before the date of the commencement of the search"); <u>Edmonds Inst. v. U.S. Dep't of Interior</u>, 383 F. Supp. 2d 105, 111 (D.D.C. 2005) (citing <u>Pub. Citizen</u>, 276 F.3d at 642) ("The D.C. Circuit has all but endorsed the use of date-of-search as the cut-off date for FOIA requests.").  As the court in <u>Public Citizen</u> recognized, a date-of-search cut-off date is especially appropriate when an agency has a backlog of FOIA requests.  276 F.3d at 643.  Because a requester typically is incapable of knowing whether an agency has created new responsive records that post-date the request, a date-of-request cut-off would force the requester to "file multiple FOIA requests to obtain documents that the [agency] would have released in response to a single request had it used a later cut-off date."  <u>Id.</u>

The policy concern that animated the <u>Public Citizen</u> court applies equally in this case.  Because the Committee usually meets twice a year, (<u>see</u> Mula Decl. ¶ 11), it was likely that the Department would create new responsive records between the date of Ferguson's Request and the commencement of the agency's search.  Accordingly, if the Request date were the cut-off date, Ferguson would have had to submit a new request to

---

[6]     Notably, FSA appears to have used the commencement date of its search as the cut-off date.  (<u>See</u> Hemelt Decl. ¶¶ 15, 17).  Hemelt was assigned to manage FSA's response to the Request in December 2007.  (<u>Id.</u> ¶ 10).  According to Ferguson, he and Hemelt spoke on December 4, 2007, regarding the scope of his Request.  (Ferguson Decl. ¶ 48).  Hemelt's queries in PEPS searched for certification actions completed between January 1, 2000 and December 4, 2007.  (Hemelt Decl. ¶¶ 15, 17).

ensure that he received a complete production.  Although it is reasonable to require that

Ferguson submit another FOIA request to obtain records created in 2008 and 2009

because they post-date OPE's search, he should not have to submit one to obtain relevant

records that were created between the date of the Request and the date that OPE

commenced its search.

According to Mula, OPE commenced its search for responsive records in

November 2007.  (Id. ¶ 15).  The Department therefore will be required to produce to

Ferguson any responsive records maintained by OPE that were created between the date

of the Request (August 3, 2007) and November 1, 2007, to the extent that such records

have not already been provided to him.

> b.   FSA's Production of Records Concerning Foreign Medical
>        Schools

Ferguson contends that the Department's search in 2008 for foreign medical

schools' certifications was deficient because he did not receive records for all such

schools.  Specifically, he argues that, although Hemelt identified forty-four medical

schools in her search, the production did not include records for all forty-four schools.

(Ferguson Decl. ¶ 48).  In doing so, Ferguson mischaracterizes Hemelt's description of

the search results.

In her declaration, Hemelt states that the "searches for initial and

recertification applications completed for foreign medical schools between 2000 and 2007

located forty-four certification actions." (Hemelt Decl. ¶ 27) (emphasis added).  Hemelt's

26

search identified six foreign medical schools that completed an initial certification and thirty-eight foreign medical schools that sought recertification.  (Id. ¶¶ 20, 26). Importantly, Hemelt did not state that her search yielded a list of forty-four <u>unique</u> foreign medical schools.  Indeed, because a school could have applied for both an initial certification and recertification between 2000 and 2007, it is possible that a particular school participated in more than one certification action.  In any event, as noted above, the Court's assessment of the adequacy of the Department's search is not based on the results of that search.  <u>See</u> <u>Hornbostel</u>, 305 F. Supp. 2d at 28.  Ferguson's contention that certain records were missing from FSA's production therefore does not undermine the Department's showing that the search was reasonably calculated to discover responsive information.

Moreover, Ferguson's contention regarding the foreign medical schools' certifications overlooks the records he received as a result of the Department's supplemental search and production in 2010.  After Ferguson identified four foreign medical schools that he believed should have been included in the Department's 2008 production, the Department voluntarily conducted a supplemental search to locate additional records relating to those schools.[7]  (<u>See</u> Hemelt Decl. ¶¶ 35, 38).  That the Department's supplemental search yielded nearly 5,000 pages of additional records does not controvert the reasonableness of FSA's initial search in 2008.  <u>See</u> <u>Grand Cent.</u>

---

[7]        According to Hemelt, records relating to those four schools were not included in the Department's 2008 production because those certification actions "post-dated the cutoff date for the prior search and thus were outside the scope of the Request."  (Hemelt Decl. ¶ 36).

P'ship, 166 F.3d at 489 (agency's second search, which uncovered additional responsive

records, did not render initial search unreasonable).

> 3.     The Department's Efforts to Locate Records

Ferguson further contends that the Department's search procedures were

inadequate because the agency should have utilized additional methods to uncover

responsive records.  Specifically, Ferguson questions why the Department did not rely on

the personal knowledge of its own employees, such as Mula, to determine the location of

relevant information.  (See, e.g., Ferguson Decl. ¶¶ 21-24).  Ferguson also maintains that

the Department should have reviewed other governmental records in the public domain to

determine which foreign countries had submitted an application for a comparability

determination.  (See Pl.'s Mem. at 4).  Both assertions are meritless.

As noted earlier, FOIA does not demand that an agency undertake specific

steps in its response to a request for information.  Rather, the agency's search is evaluated

based on a reasonableness standard.  See Grand Cent. P'ship, 166 F.3d at 489.  Here, the

Department's search procedures with respect to the databases and files that it searched

were reasonably calculated to uncover responsive information.  Moreover, the Request

did not identify specific databases that the Department should have searched, other than

to suggest that certain responsive records were maintained by the Foreign Schools Team.

(See Arrington Decl. Ex. A (item five of the Request)).  Because Ferguson's Request

failed to specify additional "locations in which an agency should search, the agency ha[d]

the discretion to confine its inquiry to [its central databases]."  See Campbell v. U.S.

Dep't of Justice, 164 F.3d 20, 28 (D.C. Cir. 1998) ("agency generally need not search

every record system") (internal quotation marks omitted).

       Similarly, the Department was not obligated to interview its employees to

locate responsive records when it had searched all files likely to contain relevant

information.  See Saldana v. Fed. Bureau of Prisons, 715 F. Supp. 2d 10, 23 (D.D.C.

2010) ("agency is not required to conduct interviews, to search in places where the

requested documents are not likely to be found, or to search exhaustively").  Thus,

contrary to Ferguson's assertion, the Department's decision not to interview Mula or

other persons as part of its response to the Request did not render its search inadequate.

       Additionally, the Department's search was adequate even though it did not

consult agency records in the public domain to identify and locate responsive records.

According to Ferguson, the Department should have reviewed the Committee's agendas,

which are published in the Federal Register, to determine which foreign countries had

submitted an application for a comparability determination because the agendas list the

foreign countries to be discussed at the Committee's upcoming meetings.  (See Pl.'s

Mem. at 4).  Contrary to Ferguson's assertion, OPE's search procedures (with the

exception of the cut-off date for its search) were reasonably expected to locate and

identify relevant information about foreign countries' submissions to the Committee.

Indeed, Mula states in his declaration that OPE's search began with a review of its

electronic files organized by Committee meeting date.  (Mula Decl. ¶ 17).  Based on that

review, the OPE electronic records manager determined which applications had been

discussed at Committee meetings during the relevant time period.  (See id.).  Any

information concerning meetings that might have been gleaned from the announcements

in the Federal Register therefore would have been redundant.  In these circumstances, the

fact that OPE failed to consult the Federal Register's announcements of the Committee's

meetings does not warrant the conclusion that the Department's search was inadequate.

See Campbell, 164 F.3d at 28 (agency has discretion to search only central databases "if

additional searches [were] unlikely to produce any marginal return").[8]

> C.    Ferguson's Showing of Bad Faith is Insufficient

In sum, through its declarations from agency supervisors who oversaw the

response to Ferguson's Request, the Department has satisfied its burden of showing that

its searches were adequate (save for one aspect of OPE's search).  To avoid summary

judgment in favor of the Department, Ferguson therefore "must make a showing of bad

faith on the part of the agency sufficient to impugn the agency's . . . declarations."

Carney, 19 F.3d at 812.  Ferguson has failed to proffer such evidence.

In his papers, Ferguson offers nothing more than conclusory statements

accusing the Department of "deliberate[ly]" omitting certain responsive records and

questioning the Department's "due diligence" and good faith in conducting the searches.

---

[8]    Even if OPE had consulted the Federal Register for the Committee's meeting agendas, those records would have provided only a list of countries that were scheduled for discussion at an upcoming meeting.  (See Ferguson Decl. Ex. E (72 Fed. Reg. 39064 (July 17, 2007) (announcing Committee meeting on September 10, 2007, and listing countries "tentatively scheduled to be discussed at the meeting"))).  Importantly, the announcements in the Federal Register do not contain any information about the countries' applications — the very information that Ferguson sought in his Request.

(See Ferguson Decl. ¶ 9).  This is insufficient to establish that the Department acted in

bad faith.  See Wilner v. Nat'l Sec. Agency, 592 F.3d 60, 75 (2d Cir. 2009) (quoting

Larson v. Dep't of State, 565 F.3d 857, 864 (D.C. Cir. 2009)) ("A finding of bad faith

must be grounded in 'evidence suggesting bad faith on the part of the [agency].'").  Nor

do Ferguson's bare assertions that the Committee omitted relevant records raise an

inference of bad faith.  See SafeCard Servs., 926 F.2d at 1200 (requester's "purely

speculative claims about the existence and discoverability of other documents" is

insufficient to rebut the presumption of good faith afforded to agency affidavits).

Ferguson thus has failed to impugn the Department's declarations and establish that it

acted in bad faith.

       D.     Discovery is Not Warranted

       Finally, Ferguson contends that discovery is "necessary to retrieve the

missing documents and files" that he maintains were improperly omitted from the

Department's production.  (See Pl.'s Mem. at 7).  Ferguson further requests that the Court

review in camera "materials declared exempt from production" and allow him to depose

the Department's witnesses.  (Id. at 3).  In response, the Department asserts that Ferguson

has failed to make a showing sufficient to warrant discovery.  (See Def.'s Reply Mem. at

8-9).  The Department is correct.

       Discovery in a FOIA case is "rare and should be denied where an agency's

declarations are reasonably detailed, submitted in good faith and the court is satisfied that

no factual dispute remains."  Schrecker v. U.S. Dep't of Justice, 217 F. Supp. 2d 29, 35

(D.D.C. 2002), aff'd, 349 F.3d 657 (D.C. Cir. 2003).  Moreover, discovery is appropriate "[o]nly if the agency has not undertaken an adequate search for responsive documents." Jarvik, 741 F. Supp. 2d at 122.  "Where an agency's affidavits regarding its search are sufficient, the judge has broad discretion to forgo discovery."  Id.

Here, the Department has proffered detailed declarations describing its search efforts, and Ferguson has failed to establish that the search was conducted in bad faith.  Indeed, Ferguson has utterly failed to proffer any reason which would justify discovery.  His contention that discovery is necessary to obtain "missing" responsive records is unpersuasive since the Department's search was reasonable (except with respect to one aspect of OPE's response, as to which discovery would shed no light). Moreover, in camera review of the Department's withheld records is unnecessary inasmuch as the Department has submitted detailed declarations explaining its basis for redacting its records.  See Associated Press v. U.S. Dep't of Justice, 549 F.3d 62, 67 (2d Cir. 2008) (in camera review appropriate only when agency offers "vague or sweeping claims" to support withholding of responsive records).

IV.     Conclusion

For the foregoing reasons, the Department's motion for summary judgment is granted in part and denied in part.  By October 15, 2011, the Department shall produce to Ferguson any OPE records responsive to his Request that were created between August 3 and November 1, 2007, if such records have not previously been produced.  Since this

accords Ferguson all the relief to which he is entitled, **the Clerk of the Court is respectfully requested to enter judgment accordingly and to close this case.**

Although Ferguson paid the filing fee when he commenced this action, should Ferguson file an appeal, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Decision and Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated:     New York, New York
           September 13, 2011

_____
FRANK MAAS
United States Magistrate Judge


Copies to:

Bernard Ferguson
7 North Essex Drive
Westerly, Rhode Island 02891
[Via First-Class and Certified Mail]

Carina Schoenberger
Assistant United States Attorney
United States Attorney's Office
  for the Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007

33